UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA </br></br> v. </br></br> (1) ASHLEY NICOLE CROSS | DOCKET NO. 3:23-cr-**198-FDW** </br></br> **BILL OF INDICTMENT** </br></br> Violations: 18 U.S.C. § 1035 </br> 18 U.S.C. § 1343 </br> 18 U.S.C. § 1347 </br> 18 U.S.C. § 1349 </br> 18 U.S.C. § 1956(a)(1)(A)(i) |

THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

## INTRODUCTION

1. Beginning no later than March 1, 2016, and continuing through on or about December 31, 2021, ASHLEY NICOLE CROSS (CROSS), defendant herein, devised and executed a scheme to defraud the South Carolina Medicaid Program (SC Medicaid) of at least $400,000 by misusing Medicaid beneficiary personal identifying information (PII) to create false and fraudulent reimbursement claims for services that were not performed. CROSS paid a person known to the Grand Jury as Individual #1 to obtain the names and personal identifying information (PII) of persons eligible for Medicaid services. CROSS also made false statements and directed employees of her company, Odyssey Health Group (OHG), to create fictitious patient clinical notes which she submitted to healthcare benefit programs in order to cover-up OHG's fraudulent claims for services that were not performed.

2. Beginning on or about April 3, 2020, and continuing through on or about May 14, 2022, CROSS devised and executed a scheme to fraudulently obtain Paycheck Protection Program (PPP) loans on behalf OHG and a business owned by a person known to the Grand Jury as Coconspirator A. As a result of the fraudulent PPP loan applications and supporting documents, CROSS obtained more than $120,000 in COVID relief funds for herself and Coconspirator A.

**Relevant Individuals and Entities:**

3. CROSS was the Chief Executive Officer of OHG, an outpatient behavioral health services provider whose principal offices were located in Charlotte, North Carolina. OHG was enrolled as a rehabilitative behavioral health services (RBHS) provider with the South Carolina Department of Health and Human Services (SCDHHS) under a

3. program in which South Carolina Medicaid beneficiaries could choose qualified providers within the South Carolina Medical Service area. The South Carolina Medical Service area included providers in North Carolina located within 25 miles of the South Carolina state border.

4. CROSS was an Independent Social Worker-Clinical Practice (LISW-CP) licensed by the South Carolina Board of Social Work Examiners. CROSS was enrolled with SCDHHS as a RBHS provider, which included LISW-CPs with a master's degree from a board approved social work program. As part of her SCDHHS enrollment, CROSS was required to know and follow procedures for submitting RBHS claims to SC Medicaid. CROSS was also enrolled as RBHS with South Carolina managed care organizations (MCOs), including Select Health of South Carolina (Select); Molina Community Health Solutions (Molina), Absolute Total Care (ATC), Bluechoice Healthplan of South Carolina (Bluechoice), and Wellcare of South Carolina (Wellcare).

5. CROSS and OHG employed persons known to the Grand Jury to submit claims for payment to SCDHHS and its MCOs. CROSS also employed persons known to the Grand Jury to prepare clinical service notes documenting the services that OHG provided to South Carolina Medicaid beneficiaries. CROSS directed the work of OHG billers and note preparers, including their submission of claims for services not performed and the creation of fictitious clinical service notes to cover up OHG's fraudulent Medicaid claims.

6. Individual #1 worked in South Carolina with non-profit organizations that provided Medicaid targeted case management (MTCM) services to underprivileged families. SC Medicaid reimbursed qualified providers for MTCM services, which included time spent helping certain high-risk Medicaid beneficiaries gain access to medical, clinical, social and educational services. Individual #1 had access to certain providers' lists of MTCM clients' Medicaid numbers and other PII, which lists she sold to CROSS in exchange for a fee paid by OHG for each eligible Medicaid beneficiary. CROSS used Individual #1's lists to bill SC Medicaid for RBHS.

7. ASAP Tax Express, Inc. (ASAP) was a tax preparation business controlled by CROSS with its principal place of business in Charlotte, North Carolina.

8. Coconspirator A, an unindicted coconspirator herein, was CROSS's boyfriend, who at pertinent times listed his home address at the luxury apartment leased by CROSS in Uptown Charlotte. Coconspirator A was the owner and CEO of Gucci International Inc. (Gucci), a North Carolina corporation purportedly in the "event planning" business. Gucci listed the same Charlotte, North Carolina business address as ASAP.

9. Coconspirator A was a named defendant in an indictment filed in the District of South Carolina on August 13, 2019. Conspirator A later pled guilty to a charge in the Indictment and reported to the Bureau of Prisons to serve a 60-month term of imprisonment on or about February 10, 2021.

## SOUTH CAROLINA'S MEDICAID PROGRAM

10. SC Medicaid was a health care program that provided health coverage to over 1.3 South Carolinians, including eligible low-income adults, children, pregnant women, elderly adults and people with disabilities. SC Medicaid was administered by SCDHHS, according to federal requirements. The program was jointly funded by South Carolina and the federal government. SC Medicaid operated, in relevant part, as follows:

   a. SC Medicaid helped pay for reasonable and medically necessary services for qualifying, enrolled individuals and their families (referred to herein as "beneficiaries.") Covered benefits included RBHS.

   b. SC Medicaid oversaw mental health providers throughout the state and within the South Carolina Service area who received payments from SC Medicaid. The SC Medicaid system included both traditional fee-for-service (FFS) Medicaid and contracted MCOs.

   c. MCOs contracted with SCDHHS to provide Medicaid health benefits and additional services for a set per member per month (capitation) payment. MCO plans were required to provide eligible Medicaid beneficiaries with medically necessary care for all contracted services, including RBHS. Providers also must have enrolled with each MCO to provide services to that MCO's members. SC Medicaid beneficiaries could choose from a list of MCOs. Providers then submitted claims for services to the MCO that covered that beneficiary. OHG fraudulently billed several MCOs, including Select, Molina, ATC, Bluechoice, and Wellcare.

   d. Qualified individuals could enroll as SC Medicaid beneficiaries. At the time of enrollment, a beneficiary received a unique alphanumeric code issued by the program, known as a SC Medicaid identification number (MIN). Beneficiaries used their MINs to receive covered services.

   e. SC Medicaid beneficiaries received services from medical practitioners (referred to herein as "rendering providers") and companies (referred to herein as "billing providers"). Rendering providers and billing providers had to obtain a federal identification number, known as a National Provider Identifier (NPI number). All SC Medicaid rendering providers and billing providers had to certify that they would only bill SC Medicaid for medically necessary services they actually perform.

   f. Each claim submitted to SC Medicaid had to identify a diagnosis code and a billing code. Providers used a standardized billing coding system established by the American Medical Association (AMA) known as the Current Procedure Terminology (CPT) to describe services performed by a qualified professional. Another set of medical codes known as the Healthcare Common Procedure Coding System (HCPCS) was used to describe medical procedures, supplies, products and services not included in CPT codes.

g. Each type of service had its own maximum number of units billable per beneficiary per day. Modifiers were codes that described how services were provided and how much to pay for those services. Common modifiers included codes for how many times a service was done, what setting it was done in, what type of professional did it, and what device or approach was used.

11. SC Medicaid and its MCOs were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b).

## CROSS'S SCHEME TO DEFRAUD SC MEDICAID

12. CROSS would obtain the PII of SC Medicaid beneficiaries from Individual #1 and other sources. CROSS would cause OHG to file claims for reimbursement with SC Medicaid and its MCOs for RBHS purportedly provided to Medicaid beneficiaries that she and others recruited for OHG.

13. Individual #1 would provide CROSS with spreadsheets with Medicaid beneficiary PII. OHG would use these lists to bill SC Medicaid for RBHS codes that were not provided, including claims backdated from the initial date of service. CROSS would pay Individual #1 for each name on the list that qualified for Medicaid services provided by OHG.

14. From on or about March 2, 2016, through on or about May 11, 2021, CROSS caused OHG to pay Individual #1 more than $18,000 for marketing OHG to Medicaid beneficiaries and for lists of Medicaid beneficiary names and PII obtained from Individual #1's MTCM clients.

15. From on or about January 2, 2017, through on or about August 25, 2022, CROSS caused OHG to bill SC Medicaid and its MCOs more than $1.3 million, of which at least $400,000 was for Medicaid beneficiaries who received no services from CROSS or OHG or fewer and different services than claimed by CROSS or OHG.

## FALSE STATEMENTS RELATING TO A HEALTH CARE MATTER

16. In and around September 2019, Select attempted to conduct an onsite audit of medical records at OHG's Charlotte office, but the office was closed. When contacted by telephone, CROSS stated she was out of town, but agreed to cooperate in Select's audit. Select's investigator sent an email and letter to CROSS requiring her to produce certain accreditation documentation and the medical records of 41 specified Medicaid patients purportedly treated by OHG. CROSS subsequently sent Select's investigator patient clinical notes for 41 OHG clients by email.

17. Dozens of the patient clinical notes sent by CROSS to Select were "cloned" and/or contained inconsistencies and clearly erroneous information. For example, clinical notes for multiple OHG clients were substantially identical except for the name of the client, dates and place of service, and diagnosis. One of the notes stated the client—who was 4 years old at the time of the session—was able to read a skills training worksheet and "identify triggers." Another stated that the therapist discussed with the client—who was

6 years old at the time—"that teens respond to conflict in many ways." Another client who was three years old "was able to read from [a] worksheet ... cease all temper tantrums and gain self-control." Some notes referred to the patient with the wrong name in the narrative—i.e., a name that did not correspond with the heading on the record. Other notes referred to group therapy provided in individual sessions.

18. CROSS signed each of the notes provided to the Select investigator. Moreover, CROSS knew the notes she provided to Select were fake. For example, CROSS had previously directed an employee to "make sure [another employee] knows which clients are adults versus kids. All adults have a depression diagnosis so their notes should focus on that. All kids have anger goals. So let me know if she need help. I don't want her having to redo notes."

19. On or about October 8, 2019, Select's investigator interviewed CROSS by telephone. CROSS who was in Charlotte, North Carolina, answered with many material misrepresentations, including the following.

>    Investigator: Do any of your employees go out into the community to recruit clients?
>
>    CROSS: No

20. CROSS knew that her statement to Select's investigator was false because she had paid Individual #1 to solicit clients in community libraries and for lists of Medicaid beneficiary names and PII from Individual #1.

21. The false clinical notes and statements made and submitted by CROSS to Select were material to Select who was contracted with SCDHHS to implement a program to prevent fraud, waste, and abuse of Medicaid funds.

## THE MONEY LAUNDERING SCHEME

22. CROSS received and accepted payment from SC Medicaid and its MCOs through electronic funds transfers into SunTrust Bank account number ending in 1929 (SunTrust account #1929) and JP Morgan Chase account number ending in 9252 (Chase account #9252), both held in the name of OHG. CROSS was the only signatory on OHG's bank accounts. CROSS opened OHG's bank accounts in Charlotte, North Carolina.

23. From on or about December 14, 2016, through on or about January 25, 2022, CROSS caused SC Medicaid and its MCOs to electronically deposit payments for false claims into SunTrust account #1929 and Chase account #9252 in the approximate amount of $404,000, which funds were comingled with other deposits into OHG's bank accounts.

24. In total, OHG received at least $404,000 in fraudulent payments from SC Medicaid and its MCOs constituting the proceeds of CROSS's scheme to defraud SC Medicaid as described above.

25. CROSS used comingled criminal proceeds from OHG's SunTrust and Chase accounts to pay expenses necessary to keep OHG operational, to bill SC Medicaid for future false claims, and to pay Individual #1 for Medicaid beneficiary names and PII.

26. From on or about August 17, 2018, through on or about March 11, 2022, CROSS withdrew over $500,000 from OHG's bank accounts in untraceable cash. CROSS also spent approximately $267,000 on shopping and entertainment and $249,000 in rent for luxury apartments in Uptown Charlotte from OHG bank accounts with comingled proceeds from her Medicaid fraud scheme.

## COVID RELIEF PROGRAMS:

27. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a federal law enacted on or about March 27, 2020, and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for the expansion of others, including programs created and/or administered by the Small Business Administration (SBA), to administer the emergency relief.

28. PPP was a COVID-19 pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

29. In order to obtain a PPP loan, a qualifying business must have submitted a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) must have stated, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses, such as their prior year tax returns.

30. PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located in Oregon or Virginia. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business.

31. The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the

borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses. The PPP allowed the interest and principal on PPP loans to be entirely forgiven if the business spent the loan proceeds on eligible expenses within a designated period and used a defined portion of the PPP loan proceeds on payroll expenses.

32. The following lenders, among others, funded PPP loans:

   a. Itria Ventures, LLC (Itria) was a financial services company that utilized a loan application portal in the state of New York, as part of conducting nationwide business operations.

   b. Customers Bank was a federally insured financial institution located in Pennsylvania.

33. Between on or about April 3, 2020, and continuing through on or about May 14, 2022, CROSS engaged in a scheme to defraud the SBA and SBA-approved lenders to unjustly enrich herself and Coconspirator A by obtaining COVID relief funds by means of materially false and fraudulent pretenses, representations, and promises.

34. It was part of the scheme that CROSS knowingly submitted, and caused to be submitted, PPP loan applications and supporting documents for OHG that contained materially false statements and misrepresentations regarding OHG's businesses' income, gross revenues, expenses, and number of employees, and caused more than $70,000 in fraudulently obtained relief funds to be disbursed to bank accounts she controlled.

35. It was part of the scheme that CROSS knowingly submitted, and caused to be submitted, PPP loan applications and supporting documents for Gucci that contained materially false statements and misrepresentations regarding Gucci's income, gross revenues, expenses, and number of employees, and that Coconspirator A was not the subject of an indictment. CROSS also called the company processing Gucci's PPP loan falsely stating that she was Coconspirator A's wife and that Coconspirator A was not able to speak because he was driving, when in fact Coconspirator A was then in federal prison. CROSS and Coconspirator A caused more than $52,000 in fraudulently obtained relief funds to be disbursed to bank accounts that Coconspirator A controlled.

## COUNTS ONE THROUGH NINE
## 18 U.S.C. § 1347
## (Health Care Fraud)

36. The Grand Jury re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1, 3 through 6, and 10 through 21 of this Bill of Indictment and further alleges that:

37. On or about the dates listed below for each of Counts One through Nine, within Mecklenburg County, in the Western District of North Carolina, and elsewhere, the defendant,

## (1) ASHLEY NICOLE CROSS

did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain by means of materially false and fraudulent pretenses, representations and promises, money owned by and under the custody and control of SC Medicaid and its MCOs, in connection with the delivery of, and payment for, healthcare benefits, items and services by submitting and causing to be submitted false and fraudulent claims to SC Medicaid and its MCOs for the payment of RBHS purportedly provided to the SC Medicaid beneficiaries listed below, as stated in OHG's claims:

| Count | Medicaid Beneficiary | Entity Billed | Claimed Dates of Service | Dates False Claims Submitted |
|---|---|---|---|---|
| ONE | MAL | Molina | 9/25/2018 through 12/20/2018 | 10/23/2018 through 1/15/2019 |
| TWO | ANT | Select | 12/21/2018 through 2/16/2021 | 1/3/2019 through 11/19/2021 |
| THREE | JAD | Select | 4/26/2019 through 4/25/2020 | 5/9/2019 through 5/4/2020 |
| FOUR | SLJ | Select | 4/24/2019 through 9/28/2019 | 5/2/2019 through 10/4/2019 |
| FIVE | ODC | Select | 5/8/2019 through 9/28/2019 | 5/21/2019 Through 10/4/2019 |
| SIX | LB | Molina | 11/18/2019 through 4/23/2020 | 12/17/2019 Through 5/5/2020 |
| SEVEN | MDI | Select & Molina | 9/26/2018 through 7/10/2019 | 10/9/2018 through 8/6/2019 |
| EIGHT | ASP | Select | 11/21/2019 through 2/13/2021 | 12/17/2019 through 2/22/2021 |
| NINE | KOF | ATC | 12/17/2019 through 1/23/2020 | 1/7/2020 through 2/1/2020 |

All in violation of Title 18, United States Code, Section 1347.

## COUNT TEN
## 18 U.S.C. § 1035
### (False Writings Relating to a Healthcare Matter)

38. The Grand Jury re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1, 3 through 6, and 10 through 21 of this Bill of Indictment and further alleges that:

39. Beginning on or about October 1, 2019, and continuing through on or about October 2, 2019, in Mecklenburg County, with the Western District of North Carolina, and elsewhere, the defendant,

### (1) ASHLEY NICOLE CROSS

did knowingly and willfully make and use materially false writings and documents to wit: fictitious and false patient clinical notes, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services involving Select and SC Medicaid, health care benefit programs as defined in 18 U.S.C. § 24(b).

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## COUNT ELEVEN
## 18 U.S.C. § 1035
### (False Statements Relating to a Healthcare Matter)

40. The Grand Jury re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1, 3 through 6, and 10 through 21 of this Bill of Indictment and further alleges that:

41. On or about October 8, 2019, in Mecklenburg County, with the Western District of North Carolina, and elsewhere, the defendant,

### (1) ASHLEY NICOLE CROSS

did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representations, to Select's investigator as described above, in connection with the delivery of and payment for health care benefits, items, and services involving Select and SC Medicaid, health care benefit programs as defined in 18 U.S.C. § 24(b).

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## COUNTS TWELVE and THIRTEEN
## 18 U.S.C. § 1956(a)(1)(A)(i)
## (Promotion Money Laundering)

42. The Grand Jury re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1, 3 through 6, 10 through 26 of this Bill of Indictment and further alleges that:

43. On or about the dates listed below for each of Counts Twelve and Thirteen, within Mecklenburg County, in the Western District of North Carolina, and elsewhere, the defendant,

### (1) ASHLEY NICOLE CROSS,

aided and abetted by others known and unknown to the grand jury, did knowingly conduct, attempt to conduct, and cause others to conduct, the following financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, health care fraud in violation of Title 18, United States Code, Section 1347; knowing that the transactions were designed in whole and in part to promote the carrying on of a specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, each transaction constituting a separate Count:

| Count | Transaction Date | Amount | Description |
|---|---|---|---|
| TWELVE | 5/3/2019 | $1,500 | ADP Direct Deposit Checking Acct. No. XXXXXX5667 |
| THIRTEEN | 5/31/2019 | $315 | Check Card Purchase TR Date 05/30 SQC Darlene Tate XXXXXX3176 CA from SunTrust Account # 1929 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

## COUNT FOURTEEN
## 18 U.S.C. § 1343
## (Wire Fraud)

44. The Grand Jury re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 2 through 3, 7 through 9, and 27 through 34 of this Bill of Indictment, and further alleges that:

45. On or about February 26, 2021, in Mecklenburg, in the Western District of North Carolina, and elsewhere, the defendant,

**(1) ASHLEY NICOLE CROSS**

aided and abetted by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute a scheme to defraud financial services companies administering the PPP loan program and to obtain money from said companies and the SBA, did knowingly cause to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, that is, the electronic transfer of approximately $70,047, the proceeds of a PPP loan, from Itria's bank accounts in the state of New York, to OHG's bank account in Charlotte, North Carolina.

All in violation of title 18, United States Code, Section 1343.

## COUNT FIFTEEN
## 18 U.S.C. § 1349
## (Wire Fraud Conspiracy)

46. The Grand Jury re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 2, 7 through 9, and 27 through 35 of this Bill of Indictment, and further alleges that:

47. Beginning no later than April 3, 2020, and continuing through on or about May 14, 2022, in Mecklenburg, in the Western District of North Carolina, and elsewhere, the defendant,

**(1) ASHLEY NICOLE CROSS**

did knowingly combine, conspire, confederate, and agree with Coconspirator A and other persons known and unknown to the Grand Jury to commit wire fraud in violation of Title 18, United States Code, Section 1343.

## MANNER AND MEANS

The conspirators carried out the conspiracy through the manner and means described above in the Introduction of this Bill of Indictment, among others.

All in violation of Title 18, United States Code, Section 1349.

## COUNT SIXTEEN
## 18 U.S.C. § 1343
## (Wire Fraud Affecting a Financial Institution)

48. The Grand Jury re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 2, 7 through 9, and 27 through 35 of this Bill of Indictment, and further alleges that:

49. On or about June 16, 2020, in Mecklenburg, in the Western District of North Carolina, and elsewhere, the defendant,

### (1) ASHLEY NICOLE CROSS

aiding and abetting Coconspirator A and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute a scheme to defraud financial services companies administering the PPP loan program and to obtain money from said companies and the SBA, did knowingly cause to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, that is, approximately $52,234 from and affecting Customers Bank, a federally insured financial institution in the state of Pennsylvania, to Gucci's bank account in Charlotte, North Carolina.

All in violation of Title 18, United States Code Section 1343.

### NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

50. Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

   a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

   b. All property involved in the violations or traceable to property involved the violations alleged in Counts Twelve and Thirteen of this Bill of Indictment; and

   c. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) or (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a) and (b).

51. The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment in the amount of at least $526,000, such amount constituting the proceeds of the violations set forth in this Bill of Indictment.

A TRUE BILL

GRAND JURY FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

Michael E. Savage
Assistant United States Attorney